# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Binyam Gebreslassie | Civil No. 05-326 (DWF/JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Lyngblomsten; Lyngblomsten Care Center, Inc.; and Lyngblomsten Foundation; | |
| Defendants. | |

---

Jordan S. Kushner, Esq., Law Office of Jordan S. Kushner, counsel for Plaintiff.

Paul J. Zech, Esq., and H. Le Phan, Esq., Felhaber Larson Fenlon & Vogt, PA, counsel for Defendants.

---

This matter came before the Court on May 12, 2006, pursuant to a Motion for Summary Judgment brought by Defendants Lyngblomsten Care Center, Inc., Lyngblomsten, and Lyngblomsten Foundation (collectively, "Defendants"). In his Complaint, Plaintiff Binyam Gebreslassie asserts race, color, and national origin discrimination and retaliatory discharge in violation of 42 U.S.C. § 1981; Title VII of the Civil Rights Act; the St. Paul Human Rights Act, as contained in St. Paul Code Chapter

183; and the Minnesota Worker's Compensation Act, Minnesota Statute § 176.82.[1] For the reasons set forth below, Defendants' motion is granted.

## Background

Defendant Lyngblomsten is a nonprofit social-ministry organization. Defendant Lyngblomsten Foundation is a Minnesota nonprofit corporation that raises funds for the benefit of the other Lyngblomsten entities. Lyngblomsten Care Center is a Minnesota nonprofit corporation that owns and operates a residential nursing home in St. Paul, Minnesota.

Gebreslassie is a black male of Ethiopian descent. Gebreslassie was employed by Lyngblomsten Care Center from January 10, 2000, until his termination on January 23, 2004. During that time, Gebreslassie acted as a nursing assistant. In addition, from December 30, 2002, until October 3, 2003, Gebreslassie was promoted to the role of neighborhood coordinator,[2] a job which he performed half-time in addition to his half-time duties as nursing assistant.

Gebreslassie asserts that he first began suffering discriminatory treatment in July 2003, when Lyngblomsten Care Center hired Amy MacKenzie Wiffler ("Wiffler") as the Administrator for the nursing home. In her duties as Administrator, Wiffler was

---

[1] Gebreslassie's disability claims brought pursuant to the Americans with Disabilities Act and the Saint Paul Human Rights Act have been voluntarily dismissed. (Doc. No. 43.) In addition, Gebreslassie voluntarily dismissed his claims against Lyngblomsten Services, Inc.

[2] Lyngblomsten Care Center is divided into fourteen "neighborhoods." Gebreslassie's role as neighborhood coordinator required him to work with the nursing supervisor to provide oversight and management of the Norway House Neighborhood, including the supervision of other nursing assistants.

responsible, among other things, for supervising all of the neighborhood coordinators, including Gebreslassie.

Gebreslassie asserts that Wiffler addressed him in a disrespectful manner, mainly because Wiffler used hand gestures that, in Gebreslassie's culture, were offensive. Yet Gebreslassie never informed Wiffler that her hand gestures were insulting. Instead, Gebreslassie complained to the Director of Human Resources, Wes Johnson. In addition, Gebreslassie complained to Johnson that Wiffler failed to compliment him (Gebreslassie) regarding his work, that Wiffler would address him in the hallway when she wanted to talk to him rather than send him an email, that Wiffler would cut Gebreslassie off from speaking during meetings, and that Wiffler would treat other neighborhood coordinators more favorably by visiting their neighborhoods or speaking to them in a more encouraging manner. Gebreslassie admittedly never told Johnson that he believed that Wiffler's conduct was directed toward him because of his race or national origin. (Dep. of Binyam Gebreslassie ("Gebreslassie Dep.") at 148.)

On October 3, 2003, Gebreslassie met with Wiffler and discussed his frustration with the amount of work he was doing as both nursing assistant and neighborhood coordinator. (*Id*. at 152-53.) Although Gebreslassie asserts that he did not formally resign because he did not sign a paper regarding his resignation, Gebreslassie himself raised the issue of terminating his position as neighborhood coordinator and going back to only acting as a nursing assistant. (*Id*.)

On October 5, 2003, Gebreslassie injured his back while he and another nursing assistant were transferring a resident using a two-person lift, a lift that is performed by

3

having two people underneath the resident's arms to lift the resident up.  Defendants assert that the lift was not in accordance with the resident's care card, but it is unclear on the record before the Court whether Gebreslassie complied with the care card.  (*See* Aff. of H. Le Phan in Support of Mo. for Summ. J. ("Phan Aff.") at Ex. G.)  According to Wiffler, Gebreslassie became very angry and defensive when confronted with the resident's care card.  Regardless, Gebreslassie saw a doctor right after the injury occurred and Defendants prepared an accident report.  Gebreslassie made a claim for worker's compensation soon after his injury.  It is not clear when Defendants became aware of Gebreslassie's worker's compensation claim.  (*See* Dep. of Amy McKenzie Wiffler ("Wiffler Dep.") at 42.)

On approximately October 9, 2003, Wiffler received a letter from the daughter of a resident claiming that her father had been "slapped across the face with a wet cloth" by a male aid.  (Phan Aff. Ex. H.)  A separate family complained of rough treatment by Gebreslassie on approximately October 11, 2003.  (Phan Aff. Ex. I.)  Wiffler determined that Gebreslassie and Tom Nyaanga were the nursing assistants involved in both incidents and, pursuant to the center's Vulnerable Adult Policy, suspended both Gebreslassie and Nyaanga pending an investigation, effective October 11, 2003.  Wiffler contacted Gebreslassie and notified him of the suspension and told him not to report to work.  However, Gebreslassie still came to work on October 13, 2003, at which point Wiffler sent him home.

Gebreslassie was called back to work on October 15, 2003, and told that the allegations of resident abuse were unsubstantiated, and that he would be reinstated with

4

full back-pay. According to a report written after the meeting with Wes Johnson, Mickey Martinson (the nursing supervisor), and Wiffler, Gebreslassie was "very emotional, angry, defensive & defiant" at this meeting. (Phan Aff. Ex. M.) As a result of his alleged anger issues, Gebreslassie was moved to a different neighborhood and placed on a 30-day review plan. Gebreslassie, however, asserts that he did not have anger problems. (Gebreslassie Dep. at 257.) Further, Gebreslassie asserts that he was not shown the document outlining the expectations regarding his alleged anger issues. Yet, according to Defendants, Gebreslassie became defiant when shown the report, he would not agree to the expectations, and he told Wiffler and Johnson that he would not sign anything. (*See* Gebreslassie Dep. at 104, 248; Johnson Dep. at 46.)

Gebreslassie was transferred to the Allison neighborhood under the direct supervision of Janet Byrnes on October 16, 2003. At this time, Gebreslassie was on restricted duty because of the back injury that occurred on October 5, 2003. According to Gebreslassie, his pay was reduced, his hours were cut, and he had to clear out the office that he was given as a neighborhood coordinator.

According to Byrnes, even though she attempted to accommodate Gebreslassie's work restrictions by allowing him some freedom to do various nursing assistant activities, even tasks of his own choosing, she began to have conflict with him within the first few days of his transfer to her neighborhood. (Byrnes Dep. at 41, 62-63.) Gebreslassie often argued with Byrnes about his assigned tasks and admittedly refused to take directives from Byrnes. (Gebreslassie Dep. at 104-105.) Gebreslassie asserts that Byrnes expressed anger in dealing with him and that she would frequently change his assignments before

5

he had a chance to finish them.  Byrnes, on the other hand, states that she was just giving Gebreslassie subsequent tasks to be completed once he finished what he was working on.

On October 21, 2003, Defendants were notified that Gebreslassie had filed a charge of discrimination with the St. Paul Department of Human Rights.  In his charge, Gebreslassie alleged discrimination based on race and national origin and reprisal.

In the Allison neighborhood, Byrnes gave Gebreslassie lists of things to do and even asked Gebreslassie to provide her with a list of things that he would like to do.  Yet Byrnes asserts that Gebreslassie continued to be uncooperative, argumentative, and refused to take directives.  This behavior resulted in a disciplinary action notice that was filed on November 21, 2003.  (Phan Aff. Ex. P.)  Johnson and Byrnes met with Gebreslassie on November 25, 2003, to discuss these issues, but Gebreslassie did not agree with the report and refused to sign it.  (*Id*.)  Gebreslassie asserts that any disciplinary write-ups were fabricated.

Defendants assert that Gebreslassie repeatedly failed to do the work assigned to him, refused to follow his supervisor's direction, and refused to tell Byrnes the tasks to which he wanted to be assigned.  Byrnes also asserts that she had difficulties "keeping [Gebreslassie] where he was supposed to be working."  (Byrnes Dep. at 81-82.)  As a result of Byrne's continued difficulties with Gebreslassie, he was issued a letter dated December 22, 2003, stating that Gebreslassie should remain in his assigned work area and inform his supervisor when he leaves that work area.  (Phan Aff. at Ex. Q.)

On December 30, 2003, Byrnes directed Gebreslassie to perform some assignments involving resident care that undisputedly fell within his work restrictions.

6

Gebreslassie was uncooperative and defiant and told Byrnes that she could not tell him what to do. (Phan Aff. Ex. R.) Byrnes issued a written warning as a result of this incident. Later that day, Byrnes and Johnson met with Gebreslassie regarding his behavior. (Phan Aff. Ex. S.) According to Johnson, Gebreslassie was "argumentative and angry." (*Id*.) Gebreslassie stated that he did not like the way Byrnes spoke to him and that "she doesn't like blacks based on a look she gave [Gebreslassie] at a neighborhood coordinator's meeting." (*Id*.) At the conclusion of the meeting, Johnson told Gebreslassie that he was receiving a written warning and that if he did not follow Byrnes' direction, Gebreslassie would be suspended.

Approximately a half hour after that meeting, Johnson was informed that Gebreslassie had hurt himself. (*Id*.)[3] Johnson completed an accident report. Then, while Johnson called Minnesota Occupational Health to make an appointment for Gebreslassie to be seen by a doctor later that day, Gebreslassie told a nurse at the center that he was injured badly and that he needed to go to the hospital emergency room. (*Id*.) Johnson told Gebreslassie that Gebreslassie's back pain did not qualify as an emergency, and Johnson refused to call 911 as Gebreslassie requested. (*Id*.) Gebreslassie then met with Brenda Johnson, a registered nurse and the Assistant Director of Nursing, who tried to

---

[3] The nature of Gebreslassie's injury is not entirely clear to the Court. It appears that Gebreslassie was injured twice on December 30, 2003. First, according to Johnson, Gebreslassie was injured while lifting a resident who was not on the list of residents to whom Gebreslassie was assigned. (Phan Aff. at Ex. S.) Gebreslassie also asserts that he was injured while unloading a box of chemicals earlier that day, before his meeting with Johnson and Byrnes. (Gebreslassie Dep. at 315-319, 421.) Undisputedly, Gebreslassie was told to lift the 10-pound bottles in the box one-by-one, a directive that was within his work restrictions. Yet it appears that Gebreslassie lifted the entire box. (*Id*. at 317-18.)

7

convey to Gebreslassie that an ambulance was not necessary for this injury, since Gebreslassie was able to walk about, stand, and sit and he was not guarding his movements. (Phan Aff. Ex. T.) Gebreslassie stated that he did not want to wait at Occupational Health for hours, but Brenda Johnson told him that Wes Johnson was able to take him there quickly if needed. Ultimately, Gebreslassie drove himself to the emergency room, where Gebreslassie was diagnosed with back pain, given some pain killers, and told to see his doctor at Minnesota Occupational Health.

In early January 2004, Byrnes asked Gebreslassie again to provide her with a list of tasks that he would like to do that fell within his restrictions. Gebreslassie responded that it was Byrnes' job to find work for him. As a result, Gebreslassie was assigned to work in the laundry room effective January 9, 2004. Gebreslassie resented the work in the laundry room and felt that he was being treated unfairly. Gebreslassie felt that the temperature in the laundry room was too cold and that the conditions were dusty and dirty. Gebreslassie complained to Wes Johnson that he believed he was being treated differently, at which time Wes Johnson pointed out other nursing assistants on restrictions who were given laundry duties. Wes Johnson dismissed Gebreslassie's complaints as a "power struggle" between Byrnes and Gebreslassie.

Gebreslassie filed another charge of discrimination on January 6, 2004. (Phan Aff. Ex. AA.) Defendants received notice of this charge on January 17, 2004.

On January 9, 2004, Gebreslassie refused to report to the laundry room as Byrnes had directed, resulting in a confrontation between the two. Gebreslassie repeatedly refused to acknowledge or comply with Byrnes' directions. When Gebreslassie finally

8

went to the laundry room, he complained that it was too cold and began arguing with Byrnes regarding the tasks to which he was assigned.  As a result of Gebreslassie's behavior, Byrnes reported to Johnson that Gebreslassie was arguing with her and not following her directives.  (Phan Aff. Ex. W.)   Johnson met with Gebreslassie and suspended him for three days due to his failure to follow Byrnes' directions.  (*Id*.)

Gebreslassie returned to work on January 12, 2004, with a doctor's note saying that he should avoid work in cold temperatures.  (Phan Aff. Ex. Z.)  On that day, Johnson provided Gebreslassie with the papers regarding his suspension.  The disciplinary action notice stated that if Gebreslassie continued to ignore Byrnes' directives, he would be terminated.  (Phan Aff. Ex. X.)   Gebreslassie again refused to sign the notice.

In response to Gebreslassie's complaints regarding the temperature in the laundry room, Johnson and Byrnes checked the thermostat in the laundry room and determined that the room was approximately 63 degrees at 6:00 a.m. and that the temperature rose to 72 degrees within one half hour when the dryers began running.  Johnson and Byrnes also spoke with other laundry room workers who had no complaints about the temperature.  Byrnes told Gebreslassie that he could dress appropriately for the conditions.

On January 13, 2004, Byrnes and Gebreslassie had another verbal altercation after Byrnes asked Gebreslassie to perform a housekeeping task.

On January 22, 2004, Byrnes told Gebreslassie that when he finished working in the laundry area, he should entertain the residents from 1:30 p.m. until the end of his shift at 2:30 p.m.  (Gebreslassie Dep. at 361-62, 372-74.)  However, Gebreslassie left the floor at 2:00 p.m. to take a break because there was nothing to do, because he had not yet taken

9

a break, and because he wanted to discuss his work situation with Wes Johnson. (*Id*.) Gebreslassie did not tell anyone that he was leaving the floor. (*Id*. at 363.) At approximately 2:15 p.m., Byrnes realized that Gebreslassie was not on the floor that she had assigned him. At that time, Byrnes made the decision to terminate Gebreslassie because he had left his work assignment without consulting anyone.

Byrnes met with Wes Johnson the next day and told him that she wanted to terminate Gebreslassie. Johnson and Byrnes then met with Plaintiff and told him of the termination for his failure to follow Byrnes' directive that he remain in his assigned work area until 2:30 p.m. the previous day. Gebreslassie became agitated, left the office, and returned with the previous day's sign-in sheet that indicated he had signed out of his work area at 2:00 p.m. Johnson told Gebreslassie that he could have a copy of it, but Gebreslassie refused to return the sign-in sheet to Johnson. Johnson informed Gebreslassie that if he did not return the sign-in sheet, it would be considered theft and the police would be called. Gebreslassie then accused Johnson and Byrnes of firing him because he was black. Gebreslassie left the center with the sign-in sheet and Johnson filed a report with the police, but no charges were filed against him.

## Discussion

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). But as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

The parties agree that the burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to determine whether Defendants are entitled to summary judgment on Gebreslassie's claims of discrimination and retaliation. *See Griffith v. City of Des Moines*, 387 F.3d 733, 736-37 (8th Cir. 2004) (claims under Title VII are analyzed under McDonnell Douglas); *Eliserio v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005) (*McDonnell Douglas* applied to retaliation claims); *Fisher Nut Co. v. Lewis ex rel. Garcia*, 320 N.W.2d 731, 734 (Minn. 1982) (discrimination claims under St. Paul ordinance governed by Title VII standards). Under the *McDonnell Douglas* framework, if Gebreslassie is able to establish a *prima facie* case of discrimination or retaliation, the burden shifts to

11

Defendants to produce a legitimate, non-discriminatory reason for the adverse employment action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). If Defendants are able to articulate such a reason, the burden shifts back to Gebreslassie to show that the proffered reason is merely a pretext for discrimination. *Id*.

### A. Race, Color, and National Origin Discrimination

First, Gebreslassie asserts that he was discriminated against on the basis of his race, color, and national origin in violation of Title VII, Section 1981, and the St. Paul Civil Rights Ordinance. In order to establish a *prima facie* case of discrimination based on race, color, or national origin, Gebreslassie must demonstrate that (1) he was a member of a protected group; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated employees who are not members of the protected group were treated differently. *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

The parties agree that Gebreslassie is a member of a protected class and that he suffered an adverse employment action. However, Defendants assert that Gebreslassie's attempt to establish a prima facie case fails on elements two and four—namely, that Gebreslassie was not meeting the legitimate expectations of his employers and that he has failed to establish that similarly situated employees who were not members of the protected group were treated differently. The Court agrees.

First, Gebreslassie admits that he engaged in acts of insubordination by refusing directives from his supervisor. The record demonstrates that Gebreslassie was confrontational with both Byrnes and Wiffler, that he refused to perform tasks that were

12

assigned to him, and that he repeatedly questioned Byrnes' instructions. Gebreslassie admits that on the day preceding his termination, he signed out of his shift a half an hour early without notifying anyone that he had left the floor. As a result of Gebreslassie's admitted failure to follow directives, Gebreslassie's performance record preceding the time of his confrontations with Wiffler and Byrnes is irrelevant to the Court's analysis.

In addition, Gebreslassie has failed to establish that a similarly situated employee, who was not a member of the protected class, was treated differently. Gebreslassie has not offered evidence of any employee who engaged in acts of insubordination but was not disciplined similarly. Thus, Gebreslassie has failed to meet his *prima facie* case on this element as well.

Moreover, even if Gebreslassie had established a *prima facie* case of discrimination, Gebreslassie has not established that Defendants' proffered reasons for Gebreslassie's termination are a pretext for discrimination. Gebreslassie offers no evidence whatsoever that he was treated in a discriminatory fashion, other than a feeling that he was being treated differently because of his race or national origin. (Gebreslassie Dep. at 136, 245, 347.) Such speculation is insufficient to establish pretext.

In a further attempt to establish pretext, Gebreslassie asserts that many of the forms that document disciplinary measures taken against him were fabricated. Yet Gebreslassie's assertions are without merit. The fabrications that Gebreslassie alleges are neither supported by the record, nor, if true, do they lead to an inference of discrimination. Additionally, Gebreslassie's attempt to create an inference of discrimination based on the company's lack of diversity in its upper management also is

13

not relevant to the Court's determination as to whether employees similarly situated to Gebreslassie, who were not members of the protected class, were treated differently. On the record before the Court, no evidence of pretext exists.

### B. Retaliation

In order to establish a *prima facie* case of retaliation, Gebreslassie must demonstrate that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the two actions. *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 858 (8th Cir. 2005) (citation omitted). Defendants assert that there is no causal connection between Gebreslassie's charges of discrimination and the adverse employment actions. The Court agrees.

Gebreslassie's first charge of discrimination was filed on October 14, 2003, and Defendants received notice of it on October 21, 2003. As a result of this timing, no causal connection can exist between the charge of discrimination and Gebreslassie's suspension on October 11, 2003, or his discipline on October 16, 2003. Plainly, Gebreslassie was disciplined before Defendants were aware of his charge of discrimination.

Gebreslassie also asserts that the Court can infer that a causal connection exists because of the coincidence of the timing of his charges of discrimination and the other disciplinary or unfavorable actions taken against him. However, a two-month interval existed between the first charge of discrimination and Gebreslassie's assignment to the laundry room. During that two-month interval, Gebreslassie engaged in other insubordinate conduct that dilutes any inference of a causal connection. In addition,

Gebreslassie's assertion that Defendants retaliated by cutting his hours in October 2003 is belied by Gebreslassie's testimony that all hourly employees' hours were reduced at that time. Finally, the fact that the insubordination issues with Gebreslassie began well before the second charge of discrimination undercuts any inference of temporal proximity based on Gebreslassie's termination occurring six days after Defendants were made aware of the second charge of discrimination. *See Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 834 (8th Cir. 2002).

### C. Worker's Compensation

Gebreslassie asserts that he was terminated in retaliation for filing worker's compensation benefits in violation of Minn. Stat. § 176.82. That statute provides: "Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages incurred by the employee . . . ." Minn. Stat. § 176.82. Defendants assert that Gebreslassie cannot establish a *prima facie* case of retaliatory discharge because no causal connection links Gebreslassie's claim for worker's compensation benefits to his discharge.

Gebreslassie filed for worker's compensation benefits on October 14, 2003. However, his suspension occurred on October 11, 2003, before he filed for benefits. No causal connection exists between these events, or between the worker's compensation claim and Gebreslassie's voluntary resignation from the position of neighborhood coordinator on October 3, 2003. Moreover, as to Gebreslassie's remaining assertions, Gebreslassie acknowledges that he was not terminated for filing worker's compensation

benefits. (Gebreslassie Dep. at 352, 358-59.) For these reasons, Gebreslassie has not established a causal connection between his protected activity and his termination.

### D.     Remaining Issues

Defendants also moved to renew their Motion to Dismiss Defendants Lyngblomsten and Lyngblomsten Foundation on the grounds that they were not Gebreslassie's employer. (Defs.' Mem. of Law in Supp. of Mo. for Summ. J. at 2 n.1.) Because the Court has disposed of Gebreslassie's claims on other grounds, the Court need not address this issue.

## ORDER

1. Defendants' Motion for Summary Judgment (Doc. No. 38) is **GRANTED.**

2. Plaintiffs' Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.


Dated:  July 3, 2006                           s/Donovan W. Frank
                                               DONOVAN W. FRANK
                                               Judge of United States District Court